**LANCASTER COUNTY, Petitioner**

v.

**PENNSYLVANIA LABOR RELATIONS BOARD,**
**Respondent.**

Commonwealth Court of Pennsylvania.

Argued Dec. 13, 2011.
Decided Jan. 11, 2012.

---

**6.** Dr. Skorinko appears to have inadvertently referred to the date of the second incident as April 13 rather than April 14.

Susan R. Friedman, Lancaster, for petitioner.

Warren R. Mowery, Jr., Harrisburg, for respondent.

Lauren M. Hoye, Philadelphia, for intervenor AFSCME District Council 89.

BEFORE: PELLEGRINI, Judge, and SIMPSON, Judge, and LEAVITT, Judge.

OPINION BY Judge PELLEGRINI.[1]

Lancaster County (County) petitions for review of a decision of the Pennsylvania Labor Relations Board (Board) from a Unit Clarification which found that maintenance mechanics in the Lancaster County Prison (Prison) were prison guards for purposes of Section 604 of the Public Employe Relations Act (Act).[2] Because the Board erred in determining that maintenance mechanics are "guards at prisons" for purposes of the Act, we reverse.

On November 18, 2009, the County commissioners adopted a reorganization plan that put all County maintenance and custodial employees under a centralized Facilities Management Department (Department), including those assigned to the Prison. Contending that those maintenance mechanics assigned to the Prison were prison guards, AFSCME, District 89 (Union) filed a petition for unit clarification seeking that those mechanics be included

---

1. This case was assigned to the opinion writer prior to January 7, 2012, when Judge Pellegrini became President Judge.

2. Act of July 23, 1970, P.L. 563, *as amended,* 43 P.S. § 1101.604.

in the prison guard unit. The County opposed, arguing that maintenance employees were support staff and not guards, had no community of purpose with the prison guards, and should not be included in the prison guards unit.

Before the hearing examiner, both the Union and the County called a number of witnesses in support of their position. The Union called Jean Kraft (Kraft), a Maintenance Mechanic I, who testified that her job duties included care of the lawns, buildings, and grounds, indoor custodial work and trash removal, moving furniture within the Prison and for all Prison vehicles. In carrying out some of those functions, she testified that inmates eligible for work release aided her and she had the responsibility of supervising those inmates without the assistance of other corrections officers. On average, Kraft stated that she supervised approximately five inmates at a time, but she had supervised up to 12 on occasion. Kraft further testified that she had the authority to write an inmate up or direct an inmate to lockup. On cross-examination, Kraft admitted that unlike guards, she did not perform searches or carry weapons as part of her job, did not receive self-defense or other special training, did not have keys to open the access doors to the work release area of the Prison because only corrections officers had access, and if a fight among the inmates occurred, Kraft was to "call a code," which meant calling the supervising sergeants and lieutenants to handle the situation. (Reproduced Record [R.R.], at 36a–39a.) At the end of the day, Kraft testified that she was responsible for returning the inmates to work release where officers searched the inmates and re-admitted them.

Jay Lenhart (Lenhart), a Maintenance Mechanic II at the Prison, testified that his job involved handling plumbing, heat-ing, electrical, and repair work, and that he worked with inmates who were eligible for work release. He testified that he supervised inmates outside the Prison's security perimeter. Like Kraft, Lenhart also had the authority to write prisoners up and direct inmates to lockup, and he called codes as necessary. Lenhart testified that if someone in his position called off work, that person could not be replaced by another County maintenance employee. On cross-examination, Lenhart testified that he went through training classes upon being hired at the Prison, but his training was not as extensive as the training the prison guards received; he did not carry a weapon, handcuffs, or shackles, was not trained in self-defense and when supervising inmates outside the security perimeter of the Prison, if an inmate were to escape, he was not to try to stop them, but instead had to call the supervising sergeants and Lieutenants to notify them.

Thomas Dissinger (Dissinger), another Maintenance Mechanic II, testified regarding the same duties and responsibilities as Lenhart. Dissinger also stated that he had previously assisted in code calls as necessary, once helping a prison guard hold a cell door shut so an inmate could not escape. Dissinger also discussed the reorganization of all maintenance employees in the County into the Department. As a result, all County maintenance employees would have to undergo the same training that was given to maintenance employees at the Prison.

Bill Jones (Jones), a prison guard, testified that like the maintenance mechanics, he did not carry weapons, handcuffs, or shackles, but handcuffs were available to prison guards at their posts in the Prison. Jones also testified that he was required to call a code for assistance before breaking up an inmate fight. He stated that all corrections officers were trained in fire-

arms use, but not all were qualified to use them. On cross-examination, Jones stated that prison guards initially attended a five-week training course and then attended periodic training classes throughout their employment. In addition to first aid and CPR training, the officers were trained on use of force and handling emotionally disturbed inmates.

The County called Lance Seibert (Seibert), a deputy warden of the Prison who had been there for 38 years, to testify. He discussed the reorganization of the County's maintenance mechanics and stated that it impacted the maintenance department at the Prison because Daniel Kerner (Kerner), the maintenance supervisor who previously reported to the warden, now reported to another maintenance supervisor. Seibert testified that an inmate on work release (as deemed eligible by the sentencing court) was able to leave the Prison and work if he or she had a job. If the inmate did not have a job, he or she might be assigned to the community service program where they were assigned to assist with various County agencies. Seibert further testified that when an inmate was released for work release, the employers were responsible for making sure the inmate-employee did his or her job safely and securely. He went on to testify that the maintenance mechanics supervised those mechanics in the same manner as a private employer who employed a work release inmate.

Seibert also testified that maintenance mechanics were not the equivalent of prison guards because they did not receive corrections officer training or have the same contact with inmates. He testified that prison guards "have daily contact with all types of different inmates" and were trained in use of force on inmates as necessary, but maintenance employees were not similarly trained. (R.R., at 152a.) Instead, in a situation that required the use of force, maintenance employees were expected to notify security by radio, and prison guards and supervisors took over. Likewise, if a prison guard suspected that an inmate had contraband, he was expected to demand that the inmate hand it over, and if the inmate would not do so, call for backup from a supervisor, whereas a maintenance employee was simply expected to call a supervisor immediately.

Seibert stated that the training that maintenance mechanics received was the training that all new support staff members attended, including those in the cafeteria and nurses' station. He stated that while the maintenance staff was expected to supervise inmates on community service and work release to ensure that the inmates were doing their jobs correctly, the responsibility of the prison guards regarded the order and welfare of the inmates, and this was not a responsibility of the maintenance staff. In fact, maintenance employees were not recommended to step in if inmates became unruly, as it was a safety issue for the employees because they were not trained in self-defense, and it was a liability issue for the Prison because the maintenance employees were also not trained in use of force.

With regard to calling codes, anyone in the Prison—even inmates—could call codes. When a code was called, prison guards were expected to report to the area if they were nearby, while maintenance employees and other support staff were expected to avoid it. Seibert testified that there were instances where maintenance employees would be helpful in a code situation, such as a fire, but their responsibility in that situation would be strictly the maintenance issue, such as shutting off traps and pipes. However, in most code situations, or in a situation where there was "some unrest ... or the area is not

secured," all support staff was kept away from the area. (R.R., at 176a.) Seibert acknowledged that if another County maintenance employee came to the Prison, he would not be permitted to walk through the Prison unescorted, while Prison maintenance employees could.

Robert Devonshire (Devonshire), the County maintenance superintendent for facilities management, testified about the reorganization. He stated that in his 13 years with the County, he had been called to the Prison to perform some of the more "technical work," including work on "[fiberoptic] cables, termination of data wires, [and] telephone work." (R.R., at 212a.) He also stated that he had interacted with inmates who assisted him at the Prison, the County courthouse, and the public safety training center. He also stated that as a result of the reorganization, all of the Department employees would soon be wearing the same uniform, including those at the Prison.

Finally, Charles Douts (Douts), the interim director of the Department and County Administrator, also testified about the reorganization and noted the change in supervision of the maintenance employees at the Prison. Prior to the reorganization, the maintenance employees were under the authority of the warden, and under the reorganization, they were under the County facilities management director. He stated that the County commissioners determined the reorganization was necessary to have a more efficient, organized maintenance unit for the County.

The Hearing Examiner issued an Amended Proposed Order of Unit Clarification (Proposed Order),[3] which found that since 1975, the Union had represented "a subdivision of the employer unit comprised of prison security guards including Senior Guards, Special Guards, the Transportation, Maintenance and Supply employes." (Proposed Order, dated June 25, 2010, at 1.) He also found that based on Kraft's, Lenhart's, and Dissinger's statements, maintenance mechanics were responsible for supervising inmates who were eligible for work release and that they were required to follow prison security procedures, including writing inmates up, if necessary. Additionally, the maintenance mechanics who were assisted by inmates were responsible for making sure all tools used were returned. The hearing examiner noted that Dissinger had been responsible for taking inmates to lunch and making sure they received their medication and that he had had to break up fights among inmates. He found that on November 18, 2009, the County Commissioners adopted a reorganization plan that put all County maintenance and custodial employees under the centralized Department, which meant that Kerner now reported to the Department director instead of the Prison warden.

Based on these findings, the hearing examiner determined that because of the "high level of trust and responsibility the County has placed in the maintenance mechanics to properly supervise the work release inmates," the positions of Maintenance Mechanic I and II were to be considered a guard for purposes of the Act. (Proposed Order, dated June 25, 2010, at 6.) The hearing examiner further reasoned that there had been occasions where maintenance employees had to assist prison guards with inmate security, and they were often the sole people responsible for the care, custody, and control of the work release inmates they supervise. He noted that the change in the supervisory struc-

---

**3.** The original Proposed Order of Unit Clarification, dated June 23, 2010, was amended to correct typographical and grammatical errors.

ture with the reorganization did not affect the job of the maintenance mechanics, which was the essential consideration in determining whether they belonged in the unit.

■ The County filed exceptions with the Board, which were denied. The Board determined that the hearing examiner had set forth all findings necessary to properly reach his conclusion that the maintenance mechanics were properly included in the prison guard bargaining unit. The Board, therefore, directed that the Proposed Order be made absolute and final. This appeal by the County followed.[4]

On appeal, the County argues that the Board's decision was legally erroneous because maintenance mechanics do not fall within the term "guards at prisons" within the meaning of Section 604 of the Act, *see* 43 P.S. § 1101.604(3), because maintenance mechanics' duties are not directly related to the security of inmates, thereby disqualifying those employees from being considered responsible for inmate security as either a primary or secondary duty.

Section 604 of the Act provides, in relevant part that:

The board shall determine the appropriateness of a unit which shall be the public employer unit or a subdivision thereof. In determining the appropriateness of the unit, the board shall:

(1) Take into consideration but shall not be limited to the following:

(i) public employes must have an identifiable community of interest, and

(ii) the effects of over-fragmentization.

\* \* \*

(3) Not permit guards at prisons and mental hospitals, employes directly involved with and necessary to the functioning of the courts of this Commonwealth, or any individual employed as a guard to enforce against employes and other persons, rules to protect property of the employer or to protect the safety of persons on the employer's premises to be included in any unit with other public employes, each may form separate homogenous employe organizations with the proviso that organizations of the latter designated employe group may not be affiliated with any other organization representing or including as members, persons outside of the organization's classification.

Unless maintenance mechanics are considered prison guards, under this provision, it would be illegal to include them in a guards unit, even if a requisite community of interest was found.

■ In this case, maintenance mechanics are not prison guards because they are not employed by the Prison to provide security or insure that inmates remain in custody but are employed to carry out maintenance functions. They are not responsible to insure that inmates remain in custody for the terms and conditions of

---

4. Our scope of review is limited to determining whether there was a violation of constitutional rights, whether an error of law was committed, or whether the Board's necessary findings are supported by substantial evidence. *County of Lebanon v. Pennsylvania Labor Relations Board*, 873 A.2d 859 (Pa. Cmwlth.2005). We will defer to the Board's expertise so long as its conclusions are reasonable and not arbitrary or capricious. *City*

*of Philadelphia v. Pennsylvania Labor Relations Board*, 982 A.2d 136 (Pa.Cmwlth.2009). In reviewing the Board's order, "we are mindful that the [Board] possess[es] administrative expertise in the area of public employee labor relations and ... [this Court] will not lightly substitute its judgment for that of the [Board]." *AFSCME, Council 13, AFL–CIO v. Pennsylvania Labor Relations Board*, 150 Pa. Cmwlth. 642, 616 A.2d 135, 137 (1992).

that custody, do not impose discipline, handcuff inmates, perform searches or "shake-downs," quell disruptions or fights, are not responsible for escaped inmates, and do not man guard stations that allow access or egress from the prison. While they supervise work release inmates, like a private employer who has a work release employee, they do so to insure that maintenance tasks are carried out. Moreover, the only prisoners they have work responsibility over are those on work release and the maintenance mechanics do not have contact with all types of inmates.

Also, unlike maintenance mechanics, prison guards belong to a uniformed force that is expected to aid in quelling disturbances and insuring inmates' incarceration. In preparing them to ensure the inmates remain in custody, correction officers undergo an extensive, five-weeks of training in first aid, weapons training, self-defense and defensive tactics, hostage situations, inmate suicide prevention, escape situations, riots, handling emotionally disturbed inmates, and report and cell block activity log-writing and periodic training. Maintenance mechanics only attend a training course that all other mechanics in the prison attend to familiarize themselves with the prison policies, not to ensure the custody of prisoners.

Because maintenance mechanics are not prison guards within the meaning of Section 604 of the Act, the Board erred in including them as part of the prison guards unit. Accordingly, the order of the Board is reversed.

Judge SIMPSON, dissents.

### ORDER

AND NOW, this 11th day of January, 2012, the order of the Pennsylvania Labor Relations Board, No. PERA–U–09–465–E, is reversed.